FILED
JUN 05 2006
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| DIGITALWAY, INC., a California corporation, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) 06CV3056 ) JUDGE MANNING ) MAG. BROWN |
| SEARS, ROEBUCK AND CO. a New York Corporation, | ) ) ) |
| Defendant. | ) ) |

## COMPLAINT

Plaintiff, DIGITALWAY, INC., ("Digitalway"), by its attorneys, HARRIS KESSLER & GOLDSTEIN LLC and WICK PHILLIPS LLP as and for its complaint against Defendant Sears, Roebuck and Co. ("Sears"), states as follows:

### Parties

1. Plaintiff Digitalway, Inc. a California corporation, with its principal place of business located at 801 North Jupiter Road, Plano, Texas 75074. Plaintiff is a citizen of the state of Texas.

2. Defendant Sears, Roebuck and Co., a New York corporation, with its principal place of business located at 3333 Beverly Road, Hoffman Estates, Illinois 60179 is a citizen of the state of Illinois. Sears' registered agent is situated in Cook County, Illinois.

### Jurisdiction

3. The Court has diversity jurisdiction over this matter pursuant to 28 U.S.C. § 1332. The amount controversy herein exceeds, exclusive of interest and costs, the sum specified by 28 U.S.C. § 1332.

## Venue

4. Venue is proper in the Northern District of Illinois because there is a forum selection clause contained in the governing agreement, which provides that the exclusive venue for any disputes between the parties shall be in the state and/or federal courts located in Cook County, Illinois. Pursuant to 28 U.S.C. § 1391, venue is also proper in the Northern District of Illinois because Defendant Sears resides in this judicial district and because a substantial part of the events or omissions giving rise to Plaintiff Digitalway's claims occurred in the Northern District of Illinois.

## Background of Litigation

**A.  Digitalway and Sears Enter the Vendor Agreement.**

5. On or about April 20, 2005, Digitalway and Sears executed a Universal Terms and Conditions (the "UTC") agreement. Pursuant to the terms of the UTC, all purchase orders, advertising, point of sale, promotional service, promotional funding or other selling assistance agreements, buying or selling agreements, exclusivity agreements, letters of agreement, and any written amendments, waivers and consents, when considered together with the UTC, govern the terms of the relationship between the parties and are collectively defined as the "Vendor Agreement." A true and accurate copy of the UTC is attached hereto as Exhibit "A" and incorporated herein.

6. Pursuant to the terms of the Vendor Agreement, Digitalway sold Sears Merchandise (as defined in the UTC), which included a number of different models and types of portable MP3 players. Sears, in turn, would then sell the MP3 players it purchased from Digitalway to customers at its many retail stores across the country.

7. Sears purchased the MP3 players from Digitalway by issuing purchase orders (the "Purchase Orders"), which Digitalway would then fill by shipping the requested quantity of Merchandise to Sears. The terms of the agreement for payment between Digitalway and Sears as

reflected on the Purchase Orders required Sears to make payment to Digitalway within sixty (60) days of the date of the Purchase Order.

8. From April 2005 through December 2005, Sears purchased tens of thousands of MP3 players from Digitalway.

### B. Sears Refuses to Pay Digitalway the Full Amounts Due Under the Purchase Orders for "Non-Conforming" and Returned Merchandise.

9. From very early on in the parties' relationship, Sears systematically withheld paying Digitalway tens of thousands of dollars on outstanding Purchase Orders because the Merchandise was purportedly "non-conforming" and/or because the Merchandise was allegedly returned by Sears' customers.

10. Pursuant to the terms of the Vendor Agreement, Sears is entitled to deduct from Digitalway's outstanding accounts payable only those amounts related to non-conforming Merchandise and customer returns; however, in nearly every instance Sears made these deductions without providing Digitalway any written backup supporting the deductions and without obtaining Digitalway's prior approval.

11. On December 27, 2005, in-house counsel for Sears wrote Digitalway explaining that, in addition to the tens of thousands of dollars that it had deducted from Digitalway's accounts payable in the preceding months (deductions which Digitalway was, and is, in the process of disputing), Sears had debited Digitalway's account in the amount of $99,800.00 because Digitalway had allegedly failed to timely ship certain Merchandise to Sears. The Merchandise in question was shipped by Digitalway to Sears for the day-after-Thanksgiving sales, and it was received and sold by Sears.

12. According to Sears it debited Digitalway's account pursuant to Paragraph 13 of the UTC, which it contends gives it the right to, "take such measures with respect to nonconforming merchandise as is necessary to realize the benefit of the bargain and charge all direct and indirect

costs to [Digitalway]." Sears further explained that pursuant to Paragraph 15 of the UTC, it was entitled to set off any obligation it believed that Digitalway owed it by debiting any pending accounts payable to Digitalway.

13. Based on the foregoing rationale and liberal interpretation of the Vendor Agreement, Sears has withheld paying Digitalway hundreds of thousands of dollars for Merchandise it received from Digitalway and sold to its customers for a profit. The Merchandise provided by Digitalway was not "non-conforming," as Sears claims. Further, there no evidence that any of the Merchandise has been returned by Sears' customers.

14. Rather, Sears has manufactured these excuses for withholding substantial payments due to Digitalway. Sears has done so because it is no longer purchasing MP3 players from Digitalway and because it expects Digitalway to simply walk away from the hundreds of thousands of dollars it is legitimately owed.

### C. Sears Mistakenly Deducts Additional Monies Due to Digitalway Based on a Sales Volume Discount Agreement Between the Parties.

15. On or about July 19, 2005, the parties also entered into a Subsidy Program Agreement (the "Subsidy Agreement"), which provided Sears with a sales volume discount of 5% related to one of the MP3 model players sold by Digitalway to Sears, the FY500. Pursuant to the Subsidy Agreement, Sears was entitled to directly deduct 5% of the total amount due for any Purchase Order(s) submitted by Sears for the FY500 MP3 player. The Subsidy Agreement applied to shipments of the FY500, which was the only MP3 player that Digitalway was shipping to Sears when the Subsidy Agreement was executed. A true and accurate copy of the Subsidy Agreement is attached hereto as Exhibit "B" and incorporated herein.

16. In order to be entitled to the sales volume discount, Sears was required to present Digitalway with backup inventory data to substantiate the total number of Merchandise units on which Sears was seeking the sales volume discount. This data was also necessary so that

4

Digitalway could approve the inventory number of FY500 players before the discount was deducted. However, in several instances, Sears failed to provide Digitalway with this information and unilaterally deducted the sales volume discounts without obtaining Digitalway's prior approval.

17. In addition, in or about October 2005, Digitalway began shipping a new, smaller, portable MP3 player to Sears, the IMP90. The IMP90 was not subject to the same sales volume discount as the FY500. Nonetheless, in a number of instances Sears has incorrectly applied the sales volume discount to Purchase Orders related to the IMP90.

18. Digitalway has, on several occasions, requested that Sears credit back to its accounts the sales volume discount erroneously deducted from the IMP90 Purchase Orders. Notwithstanding its request, Sears has failed and refused to rectify its mistake or provide any explanation for its imposition of the sales volume discount on sales of the IMP90. As of this date, Sears owes Digitalway tens of thousands of dollars related to the improper application of the sales volume discount to sales of the IMP90.

### D. Sears Offers an Unauthorized Rebate Program to its Customers that Digitalway has Been Forced to Honor.

19. Lastly, Sears has offered its customers manufacturer rebates that do not comport with rebates authorized by Digitalway. On a number of occasions, Digitalway authorized a $20 manufacturer's rebate that was expressly limited in the following ways: (i) the rebate form had to be filled out and submitted with a copy of the sales receipt and original UPC label; (ii) the rebate request had to be postmarked no later than fourteen (14) days from the date of purchase; and (iii) the rebate was limited to one person per receipt, household, family, or address.

20. Notwithstanding the foregoing limitations, Sears has unilaterally authorized numerous of its retail stores to extend a manufacturer's rebates on Digitalway MP3 players that are much less restrictive. For example, instead of the fourteen (14) day deadline that Digitalway imposed,

5

Sears offered rebates that needed to be postmarked thirty (30) after the date of purchase, which substantially increased the number of rebate requests that Digitalway received. Additionally, Sears did not limit the number of rebate requests that could be submitted per receipt or household, which also increased Digitalway's exposure for the rebates.

21. Digitalway is also aware that the rebate program is being abused by Sears' customers with little to no oversight from Sears. One way in which customers are abusing the rebate program is by purchasing a Digitalway MP3 player, submitting the necessary documentation in order to obtain the $20 rebate, and then returning the product to Sears at a later date for a full refund or store credit. If the UPC label is missing from an MP3 player's packaging when the customer tries to return the product, Sears should not accept the return; however, there are numerous instances in which Sears has done exactly this, which has resulted in Digitalway paying rebates on Merchandise that the customer never retained. Digitalway then has to repay Sears for the returned Merchandise, and then, Sears has lost nothing while Digitalway loses both the $20 rebate and the ability to efficiently resell the returned Merchandise because it is missing the UPC label.

22. As a result of the foregoing abuses of the rebate program, all of which occurred with Sears' express or tacit approval, Digitalway has incurred substantial losses.

E.  **Digitalway Tries Repeatedly to Resolve the Dispute with Sears, to No Avail.**

23. On February 8, 2006, counsel for Digitalway sent Sears' in-house counsel a letter requesting that Sears provide an explanation of and documentation supporting the deductions debited against many of Digitalway's outstanding Purchase Orders. On February 13, 2006, counsel for Digitalway and Sears spoke, and Sears' in-house counsel stated that Digitalway would receive payment for the outstanding Purchase Orders. Later that same month Digitalway did receive a substantial payment from Sears related to the outstanding Purchase Orders; however, more than $500,000 remained outstanding.

24. Accordingly, on April 17, 2006, counsel for Digitalway sent Sears another letter requesting the same information sought back in February. On April 19, 2006, in-house counsel responded by reiterating that the deductions it had debited against Digitalway's account were valid, and that Digitalway had all the documentation and information it was entitled to from Sears. Sears in-house counsel stated that it "strongly disagreed" that it owed Digitalway in excess of $500,000. Sears also contended, for the first time, that it was allegedly owed $27,270.24 from Digitalway.

25. Since receipt of the letter of April 19, 2006, Digitalway has heard nothing from Sears. Digitalway has received minor additional payment from Sears, but the balance outstanding is still approximately $500,000.

## COUNT I
## (for Breach of Contract)

26. Digitalway repeats and alleges the allegations paragraphs 1 through 25 as and for this paragraph 26.

27. Pursuant to the Vendor Agreement, Digitalway has provided Sears with millions of dollars of Merchandise over the past year. Sears, however, has failed and refused to fully pay Digitalway for the Merchandise in violation of the terms of its Agreement with Digitalway.

28. In addition, Sears has exposed Digitalway to liability for rebate claims that were not approved by Digitalway and which Digitalway has been caused to honor which has resulted in damages to Digitalway. Moreover, Digitalway has incurred damages as a result of Sears' unauthorized rebate practices that Sears alone is in a position to monitor and safeguard against.

29. All conditions precedent to Digitalway's right to recover have been performed or have occurred.

WHEREFORE, Plaintiff, DIGITALWAY, INC. prays that the Court enter judgment in its favor and against Defendant, SEARS ROEBUCK AND CO. for all sums found to be due at trial

and which are believed to be in the sum of $500,000.00 plus prejudgment interest, costs of suit and any and all further relief that the court deems just and fair and which is supported by the evidence.

Dated: June 5, 2006

By: *[signature]*
DIGITALWAY, INC.,
Richard N. Kessler

HARRIS KESSLER & GOLDSTEIN, LLC
640 North LaSalle Street, Suite 590
Chicago, Illinois 60610
Telephone: 312.280.0111
Facsimile: 312.280.8232
Illinois State Bar No. 6183140

and

WICK PHILLIPS LLP
K. Todd Phillips
Brian P. Lauten
500 N. Akard Street, Suite 2100
Dallas, Texas 75201
(214) 692-6200

Attorneys for Plaintiff

# Sears, Roebuck and Co.
## Universal Terms and Conditions

The terms and conditions contained herein ("UTC") shall be effective as of the date set forth below and shall apply to all Merchandise (defined below) sold by the undersigned vendor ("Seller"), directly or indirectly through Seller's dealers or distributors, to Sears, Roebuck and Co. ("Sears").

**Seller and Sears hereby agree as follows:**

1. **DEFINITIONS.** The following terms (including the singular or plural as the context may require) shall have the meanings described below: (a) "Change of Control" shall mean (i) a sale of all or substantially all of the assets of Seller, whether in a single transaction or a series of transactions or (ii) the merger or consolidation of Seller with or into a limited liability company, corporation, or other entity; the merger of a limited liability company, corporation, or other entity into Seller; or the occurrence of any other event that results in fifty percent (50%) or more of the total voting power entitled to vote in the election of the board of directors of the Seller or the surviving or new entity (or in the event that Seller or the surviving or new entity is not a corporation, the equivalent to the board of directors) being held by a person or persons other than either the shareholders or members of Seller who, individually or as a group, held fifty percent (50%) or more of such voting power immediately prior to such transaction or event; (b) "Merchandise" shall mean the goods sold to Sears by Seller, directly or indirectly through Seller's dealers or distributors, as described in any applicable Vendor Agreement (defined below) or Specification (defined below), including all packaging, tags, labels, hangers, and containers used in connection therewith, all parts relating to such goods provided to Sears and all literature, whether in print or electronic form, including, without limitation, all owner's manuals, instructions and training materials pertaining to such goods, if applicable, whether or not any of such items are set forth separately on invoices to Sears; (c) "Purchase Order" shall mean a written or electronic order for the purchase of Merchandise which may include the description, quantities to be purchased, price and other information relating to the purchase of Merchandise; (d) "Specification" shall mean the detailed description of Merchandise agreed upon by Seller and Sears as contained in any Vendor Agreement (defined below) or the Vendor Information Guide (defined below); (e) "Vendor Agreement" shall mean any written agreement between Sears and Seller relating to Merchandise, including, without limitation, this UTC, all Purchase Orders, advertising, point of sale, promotional service, promotional funding or other selling assistance agreements, buying or supply agreements, exclusivity agreements, letters of agreement, and any written amendments, waivers and consents relating to any of the foregoing; and (f) "Vendor Information Guide" shall mean those policies and procedures for doing business with Sears that have been supplied or made available to Seller in print or electronic form as may from time to time be amended by Sears. Terms used herein and not otherwise defined shall have the meaning given them in the Uniform Commercial Code as in effect in the State of Illinois (the "UCC").

2. **VENDOR AGREEMENTS.**

2.1 <u>Purchase Orders</u>. The execution of the UTC shall not give rise to any commitment on the part of Sears to purchase any Merchandise. A commitment to purchase Merchandise shall arise only at such time as Sears issues a Purchase Order or enters into a separate Vendor Agreement for specific quantities of Merchandise and Sears' obligation to purchase Merchandise shall be limited to such quantities. When issued by Sears and accepted by Seller, all Purchase Orders shall become part of and be subject to the terms of the applicable Vendor Agreement. Any estimates or forecasts of Sears' future needs for Merchandise which may be provided to Seller by Sears are for planning purposes only and shall not in any way represent a commitment by Sears. Sears shall have no responsibility for any actions taken by Seller based on such estimates or forecasts.

2.2 <u>Construction and Amendment</u>. Except for those provisions in any Vendor Agreement expressly to the contrary, this UTC shall apply to, and is incorporated into, all other Vendor Agreements existing on the date hereof or hereafter executed and supercedes all previous communications, Vendor Agreements and understandings that are inconsistent with this UTC. The Vendor Agreements and the Vendor Information Guide, incorporated into the Vendor Agreements by this reference, contain the entire understanding of Seller and Sears with respect to the subject matter of such Vendor Agreements and may not be supplemented or modified by course of dealing, course of performance, any oral communication between the parties, or any response by Seller, whether oral or written, purporting to modify or supplement the terms of a Purchase Order or other Vendor Agreement unless such response is in writing and executed or consented to in writing by Sears. The Vendor Agreements may be amended or supplemented only by a revised Vendor Information Guide or another written Vendor Agreement signed by an authorized representative of each party. All Purchase Orders and other Vendor Agreements shall be deemed a series of installments in one and the same transaction and deemed to constitute a single agreement between Sears and Seller within the meaning of Section 9-404(a) of the UCC. In the event any bankruptcy or insolvency proceeding is initiated in respect of Seller and Seller, as debtor in possession, elects to perform any outstanding Purchase Orders, then Seller, by so accepting and performing any of such Purchase Orders, shall be deemed to have accepted and assumed this UTC and obligations of Seller to Sears arising from time to time hereunder.

# Sears, Roebuck and Co.
# Universal Terms and Conditions

2.3 Waiver. No right of either party under any Vendor Agreement may be waived except as expressly set forth in writing signed by an authorized representative of the party waiving such right. No waiver of any provision shall be implied by a party's failure to enforce any of its rights or remedies herein provided, and no express waiver shall affect any provision other than that to which the waiver is applicable and only for that occurrence.

3. **BUSINESS TERMS.**

3.1 Specification. Any Specification shall be in writing. Seller, by agreeing to and/or using any Specification, design, product modification or other manufacturing or production suggestion, whether originating with Sears or elsewhere, adopts as its own, accepts full responsibility for, and relieves Sears of all responsibility for any such Specification, design, modification or suggestion.

3.2 Price and Shipping. The price for Merchandise shall include all costs of packing and of delivery of Merchandise to the F.O.B. point or other delivery point specified in the applicable Purchase Order or other Vendor Agreement, including: (a) all duties and taxes (including excise and withholding taxes) payable in any country where production or delivery takes place; (b) any commissions to selling agents; and (c) other incidental charges, whether or not such charges are itemized separately on invoices to Sears. Seller shall ship only the quantities of Merchandise ordered by Sears in the applicable Purchase Order and shall make no substitutions or changes without Sears' prior written approval.

3.3 License. Seller grants to Sears a nonexclusive, nontransferable, royalty free license to use, with the right to sublicense, Seller's trademarks, service marks, trade names, trade dress, copyrights and rights of publicity associated with Merchandise for the limited purpose of Sears' marketing, promoting or selling Merchandise through any promotional, advertising or distribution channel, including, without limitation, print, television, radio or worldwide web.

4. **CODE OF CONDUCT.** Seller acknowledges that Seller has been furnished a copy of the Sears Code of Business Conduct (the "Code of Conduct") as a part of the Vendor Information Guide and that Sears associates are required to follow the Code of Conduct. Seller shall support the Code of Conduct and shall not take any action that may cause a Sears associate to violate the Code of Conduct. Seller shall notify Sears in writing by certified mail, return receipt requested, within five (5) business days after it has knowledge of any violation or attempted violation of the Code of Conduct.

5. **PACKAGING, LABELING, SHIPPING AND BILLING; RISK OF LOSS.**

5.1 Packaging, Labeling, Shipping and Billing. Seller shall be responsible for providing adequate packaging, tagging, labeling, packing, shipping and billing. Seller shall comply with all packaging, tagging, labeling, packing, shipping and billing requirements reasonably requested by Sears or established by applicable laws, regulations, carrier tariffs and classifications. For Merchandise to be shipped to Sears from a point of origin within the United States, Seller shall deliver Merchandise to the designated carrier on or before the ship date specified in the applicable Vendor Agreement. For Merchandise to be shipped to Sears from a point of origin outside the United States, Seller shall deliver Merchandise in accordance with the delivery terms specified in the applicable Vendor Agreement and such delivery shall be made on or before the ready date specified in such Vendor Agreement. Delivery dates specified shall be of the essence of the Vendor Agreement. Seller shall ship all Merchandise in full packs and full shipments in accordance with Sears' requirements as set forth in the Vendor Information Guide or any Vendor Agreement.

5.2 Risk of Loss. All risk of loss or damage to Merchandise shall remain with Seller until delivery of such Merchandise to the F.O.B. point or other delivery point specified in the applicable Purchase Order or other Vendor Agreement.

6. **MANUFACTURING.**

6.1 Manufacturing Information. Upon Sears' request, Seller shall provide Sears with specific information, in such detail as Sears may reasonably request, as to the location and method of manufacturing or assembly of Merchandise. Seller shall provide Sears with prior written notice of any change in the location of manufacturing or assembly of Merchandise and Seller shall be fully responsible for all costs and/or delays resulting from such changes. Without advance notice but during regular business hours, Sears, its designated representatives and any independent inspectors approved by Sears, may inspect any facilities at which any Merchandise or any components for Merchandise are being manufactured or assembled (including any facilities of Seller, its affiliates, subsidiaries, subcontractors and suppliers) and any and all Merchandise at any stage of manufacture, assembly or delivery (including at the F.O.B. point or other delivery point specified in the applicable Purchase Order or other Vendor Agreement). Sears may require Seller to have Merchandise inspected prior to its shipment to the United

**Sears, Roebuck and Co.**
**Universal Terms and Conditions**

States. Such inspection shall be performed at Seller's sole expense and by an independent inspector approved by Sears. Any inspection, documentation thereof and any corrective action taken by Seller with respect to any Merchandise shall not be deemed an acceptance of such Merchandise, or a waiver of any nonconformities or defects in such Merchandise and shall not excuse any failure by Seller to deliver Merchandise in accordance with the terms of the applicable Vendor Agreement.

6.2 <u>Sears Brand Merchandise</u>. Seller represents and warrants that all production facilities and subcontractors employed to manufacture or assemble Merchandise bearing any Sears Brand (defined below) are registered with the Sears Labor Compliance Office as set forth in the Vendor Information Guide. Seller further agrees that Seller shall not commence manufacture or assembly in new factories or with new subcontractors without the prior written approval of the Sears Labor Compliance Office.

7. **PARTS AND SERVICE.**

7.1 <u>Parts</u>. Seller shall sell to Sears any and all parts (or their functional equivalents) referenced or included in any Vendor Agreement or any Service Information (defined below) applicable to Merchandise for a period of at least ten (10) years after the date such Merchandise is last produced by Seller for Sears. Sears may use any such parts in the performance of warranty service. The price of parts shall be specified on the applicable Purchase Order or other Vendor Agreement but in no event shall Seller charge Sears or Sears' designated representative a price greater than the lowest price charged by Seller to any other customer for the same or similar parts sold on substantially similar terms.

7.2 <u>Service</u>. Seller shall provide Sears with all available information relating to Merchandise, including, without limitation, warranty forms, owners manuals, product specifications, parts lists, exploded parts diagrams, training materials, technical and/or service bulletins, service and installation manuals and instructions developed by or for Seller and any revisions to such information ("Service Information"). Seller shall use its best efforts to provide such Service Information in electronic form. Seller authorizes Sears to use, reproduce, distribute or sell to Sears' customers the Service Information without payment of any royalties or other fees to Seller and to provide repair, maintenance and installation services for all Merchandise sold. Seller shall designate Sears as an authorized service provider and shall include Sears, no less prominently than its other authorized service providers, on all lists or other enumeration of authorized service providers, whether in print, worldwide web or other medium. Sears may advertise that it is an authorized service provider for Merchandise. Sears shall provide such repair, maintenance and installation services in conformity with reasonable standards, rates, and guidelines and may use its subsidiaries and independent subcontractors or licensees to provide such repair, maintenance and installation services. Seller represents and warrants that the provision of such services by Sears will not violate the rights of any third party.

8. **REPRESENTATIONS AND WARRANTIES.**

8.1 <u>Merchandise</u>. Without in any way disclaiming implied remedies or limiting remedies for breach thereof, Seller represents and warrants that all Merchandise shall: (a) conform to the Specification for such Merchandise; (b) be fit and sufficient for the ordinary purpose for which Merchandise is used; (c) be free from defects in workmanship, materials and packaging; (d) be free from defects in construction and design; (e) be fit and sufficient for the purpose stated on any packaging, labeling or advertising; and (f) be equivalent in materials, quality, fit, finish, workmanship, performance and design to any samples submitted to and approved by Sears.

8.2 <u>Advertising</u>. Seller represents and warrants that all claims made by Seller in any packaging, labeling, advertising, or other consumer material in connection with any Merchandise or Seller brand relating to Merchandise shall be true and shall have been substantiated at the time that such claims are made.

8.3 <u>Intellectual Property</u>. Seller represents and warrants that: (a) all patents, trademarks, trade names, trade dress, copyrights, trade secrets, rights of publicity and other intellectual property rights (other than those intellectual property rights owned by or licensed to Sears) used by Seller in connection with Merchandise or in the development or manufacture of Merchandise are either owned by Seller or Seller has been properly authorized by the owner of such rights to use such intellectual property rights in connection with such Merchandise and to sell such Merchandise incorporating such intellectual property rights to Sears for use or further resale and (b) Merchandise will not, at the time that it is delivered, offered for sale or sold by Sears, infringe any patent, trademark, service mark, trade name, trade dress, copyright, trade secret, domain name, right of publicity or other intellectual property right of any person, corporation or other entity. Seller shall notify Sears' General Counsel in writing by certified mail, return receipt requested, within five (5) business days after it has knowledge of any claim or allegation of infringement, misuse, dilution, misappropriation or other violation of any patent, trademark, service mark, trade name, trade dress, copyright, trade secret, domain name, right of publicity or other intellectual property right in any way related to or affecting Merchandise.

## Sears, Roebuck and Co.
## Universal Terms and Conditions

8.4 **Compliance with Law.** Seller represents and warrants that: (a) all Merchandise has been or shall be produced, packaged, tagged, labeled, packed, shipped and invoiced in compliance with the applicable requirements of federal, state and local laws, regulations, ordinances and administrative orders and rules of the United States, its territories and all other countries in which Merchandise is produced or delivered; (b) Seller and all of its affiliates, subsidiaries, subcontractors, suppliers and agents involved in the production or delivery of Merchandise shall strictly adhere, and shall continue throughout the term of any Vendor Agreement to strictly adhere, to all applicable federal, state and local laws, regulations and prohibitions of the United States, its territories and all countries in which Merchandise is produced or delivered with respect to the operation of their production facilities and their other business and labor practices, including, without limitation, all laws, regulations and prohibitions governing the working conditions, wages, hours and minimum age of the work force; and (c) Merchandise has not been and shall not be produced or manufactured, in whole or in part, by child labor or by convict or forced labor. Seller shall provide Sears with any guaranty of compliance with the foregoing in such form as Sears may designate with respect to any Merchandise.

8.5 **Antidumping.** Seller represents and warrants that all sales of Merchandise to Sears shall be made at no less than fair value under the United States antidumping law and that no government has provided a countervailable subsidy for Merchandise actionable under U.S. law. Seller shall indemnify Sears for (i) all antidumping and/or countervailing duties imposed on all Merchandise that is sold prior to the date of publication of the International Trade Administration's preliminary determination of sales at less than fair value or prior to the date of publication of the existence of countervailable subsidies and exported before the date of publication of the International Trade Administration's final determination of sales at less than fair value or the existence of countervailable subsidies and (ii) any expenses (including reasonable attorneys' fees) and administrative costs incurred by Sears in its participation in any United States antidumping or countervailable duty proceeding involving any warranted Merchandise.

9. **ELECTRONIC PROCESSING.** Unless otherwise agreed by Sears, the parties shall process all Purchase Orders and other related documents (including invoices and ship notices) and any installment payments or advances in respect of all monetary obligations between Sears and Seller electronically, either directly or through a third party provider satisfactory to both parties. Each party shall be responsible for its own costs, including the costs of any provider with which it contracts. Each invoice (or ship notice, in the absence of an invoice) shall contain an appropriate, agreed upon code, symbol or statement affirming Seller's compliance with all applicable requirements of the Fair Labor Standards Act (as amended), the regulations and orders of the United States Department of Labor issued pursuant thereto and of any similar state laws and regulations. All electronic fund transfers and wire transactions shall be in accordance with National Automated Clearing House Association (NACHA) rules and in accordance with any instructions and procedures which Sears may from time to time supply. Neither party shall be liable to the other for any indirect, special, incidental, exemplary or consequential damages arising from or as a result of any delay, omission or error in the electronic transmission or receipt of any documents, even if the other party has been advised of the possibility of such damages.

10. **SEARS BRAND.** If Sears authorizes Seller to mark or label any Merchandise with a trade name, trademark, logo or service mark owned by or licensed to Sears ("Sears Brand"), such marking or labeling shall be limited to the quantities of such Merchandise set forth in a Purchase Order or in a separate Vendor Agreement or otherwise authorized by Sears and shall be done in accordance with Sears' specific written instructions. Seller shall not sell or otherwise dispose of, nor permit the sale or disposal of, any Merchandise bearing any Sears Brand (including any Merchandise rejected by Sears) to anyone other than Sears without first obtaining Sears' express written consent and then removing, or otherwise defacing as installed, any Sears Brand prior to such sale or disposal. Sears may elect, but shall have no obligation, to purchase from Seller any surplus labels, packaging or other materials bearing any Sears Brand. All such materials not purchased from Seller by Sears shall be destroyed at the expiration, cancellation, or termination of the Vendor Agreement. Seller shall have no interest or rights in any Sears Brand except as expressly granted in a Vendor Agreement.

11. **DEFENSE AND INDEMNITY.**

11.1 **Defense.** Seller shall, at its own cost and expense, defend Sears, its affiliates and its subsidiaries and any of their present and former officers, directors, employees, representatives, licensees, agents, dealers, distributors, independent contractors and any person directly or indirectly involved in the distribution or sale of Merchandise (each an "Indemnified Party") from and against all allegations (even though such allegations may be false, fraudulent or groundless) asserted in any claim, action, lawsuit or proceeding between any Indemnified Party and any third party, whether actual or alleged and whether or not Seller's Indemnity and Contribution Obligations (as defined below) shall apply, arising out of or relating to any of the following (collectively, the "Claims"): (a) the

**Sears, Roebuck and Co.**
**Universal Terms and Conditions**

infringement, misuse, dilution, misappropriation, or other violation of any patent, trademark, service mark, trade name, trade dress, copyright, trade secret, domain name, right of publicity or other intellectual property right in any way relating to or affecting Merchandise, or any unfair competition involving Merchandise; (b) death of or injury to any person, damage to any property, or any other damage or loss, by whomsoever suffered, resulting or claimed to result in whole or in part from any latent or patent defect in Merchandise, including, without limitation improper construction, installation, repair, display, service or design of Merchandise, failure of Merchandise to comply with any Specification or samples or with any express or implied warranties of Seller, or any claim of strict liability in tort relating to Merchandise; (c) any violation by Seller (or its affiliates, subsidiaries, subcontractors, suppliers, or representatives) in the manufacture, possession, use or sale of Merchandise of any federal, state or local law, regulation, ordinance or administrative order or rule of the United States, its territories or any other country in which Merchandise is produced or delivered; (d) the packaging, tagging, labeling, packing, shipping, delivery and/or invoicing of Merchandise; (e) failure to warn or to provide adequate warnings and/or instructions in the use, assembly, service or installation of Merchandise; (f) the packaging, labeling or advertising claims made by Seller; (g) the display, assembly or installation of Merchandise, or (h) the assertion by a third party of a security interest or other legal interest created by a factoring arrangement in any amount due Seller under a Vendor Agreement. Notwithstanding the provisions of the foregoing sentence, Seller shall have no obligation to defend any Indemnified Party in any action, lawsuit, or other proceeding in which the basis for the claim is confined to the sole negligence of any Indemnified Party in the display, assembly, service, repair or installation of Merchandise. Seller shall retain defense counsel satisfactory to Sears and shall, from time to time, provide reports, consult with Sears in conducting the defense of the Claims and otherwise cooperate fully with the reasonable requests of Sears; provided that only with respect to claims arising under Section 11.1(a) above, Sears may, at its election and at any time, take control of the defense and investigation of said Claims and employ attorneys and other consultants, investigators and experts of its own choice to manage and defend any such Claims at the cost and expense of Seller. The obligations of Seller under this Section 11.1 are referred to herein as the "Defense Obligations".

11.2 <u>Indemnity and Contribution</u>. Seller shall hold harmless and indemnify the Indemnified Parties from and against any and all damages, liabilities, losses, costs and expenses (including reasonable attorneys' fees, disbursements and costs of investigation) incurred by any of the Indemnified Parties in any claim, demand, action, lawsuit, or proceeding arising out of or in any way relating to any Claims; provided that Seller shall have no obligation to indemnify any Indemnified Party for damages awarded based on the sole negligence of any Indemnified Party in the display, assembly, service, repair or installation of any Merchandise. In any case in which the Seller's indemnity obligation set forth in the preceding sentence is not enforceable under applicable law and in which any Indemnified Party and Seller are found to be liable to a third party with respect to Merchandise, then Sears and Seller shall each contribute to the payment of any judgment awarded in favor of such third party in proportion to the comparative degree of culpability of the Indemnified Parties and Seller. The obligations of Seller under this Section 11.2 are referred to herein as the "Indemnity and Contribution Obligations".

12. **INSURANCE.** Seller shall obtain and maintain, at its expense, a policy or policies of Commercial General Liability Insurance covering liabilities relating to Merchandise, including products and completed operations, with a broad form vendor's endorsement naming Sears as the additional insured, in those amounts and with such companies as set forth in the Vendor Information Guide and containing such other provisions satisfactory to Sears. All such policies shall provide that the coverage thereunder shall not be terminated without at least thirty (30) days prior written notice to Sears. Certificates of Insurance evidencing such coverage shall be submitted in advance of or concurrent with the execution of the UTC by Seller and upon each policy renewal. Approval of any of Seller's Insurance policies by Sears shall not relieve Seller of any obligations contained herein, including, without limitation, Seller's Defense Obligations, Indemnity and Contribution Obligations set forth above, and claims in excess of Seller's policy limits. If at any time Seller does not provide Sears with the certificates of insurance required hereunder or if, in Sears' opinion, such policies do not provide adequate protection for Sears and Seller does not furnish evidence of acceptable coverage within fifteen (15) days after Sears so notifies Seller, Sears shall have the right, in addition to its rights under Section 14 below, to withhold making any installment payment or advance in respect of any Sears' monetary obligations which may be outstanding under any Vendor Agreement until evidence of acceptable coverage is provided.

13. **SEARS REMEDIES.** In addition to all other remedies available to Sears under the UCC or otherwise, any Merchandise may be rejected by Sears and abandoned, returned or held at Seller's expense and risk, when such Merchandise: (a) is not produced, sold, shipped and/or delivered in compliance with the terms of the applicable Vendor Agreement, or otherwise does not conform to the applicable Vendor Agreement; (b) is delivered in excess of the quantities ordered, in broken packs or partial shipments, or in packages or assortments other than as specified; (c) allegedly violates any applicable federal, state or local laws, regulations issued pursuant to such laws,

**Sears, Roebuck and Co.**
**Universal Terms and Conditions**

or any governmental administrative orders, rules or regulations of the United States, its territories or any other country in which Merchandise is produced or delivered; or (d) allegedly infringes any patent, trademark, service mark, trade name, trade dress, copyright, trade secret, domain name, right of publicity or other intellectual property right in any way related to or affecting Merchandise, or involves any unfair competition. Sears' right to reject and return or hold Merchandise at Seller's expense shall, without limiting such right, extend to Merchandise sold to Sears hereunder which was returned by a Sears customer for any reason entitling Sears to reject or revoke acceptance of such Merchandise. Sears may, at its option, require Seller to replace any nonconforming Merchandise or grant Sears a full refund or full credit (collectively, "Refund Credit"). At its election, Sears may accept nonconforming Merchandise, and Seller shall be liable for any reduced value of such Merchandise or the cost incurred by Sears to repair the same. Acceptance of Merchandise by Sears shall not relieve Seller of any of its warranty or other obligations hereunder. Sears may also charge to Seller all direct and indirect costs incurred by Sears as a result of any nonconforming Merchandise or delivery, or an administrative fee in an amount reasonably related to such costs whether or not Merchandise is rejected by Sears (collectively, "Return Costs"). Acceptance by Sears of replacement Merchandise, a full or partial credit or refund, or Return Costs, shall not relieve Seller of liability for other damages sustained by Sears as a result of Seller's failure to deliver conforming Merchandise in a timely manner or arising as a result of any other breach by Seller.

**14. CANCELLATION AND TERMINATION.** Sears shall have the right to immediately cancel or terminate any Vendor Agreement for any Merchandise or any part of Sears' obligations under such Vendor Agreement, or cancel or terminate all or any outstanding Purchase Orders for Merchandise under such Vendor Agreement if: (a) Sears reasonably believes that Seller does not have Merchandise which conforms to the terms of the Vendor Agreement and is ready for shipment in the specified quantities and on the delivery dates specified; (b) it is alleged that Merchandise infringes any patent, trademark, service mark, trade name, trade dress, copyright, trade secret, domain name, right of publicity or other intellectual property right; (c) it is alleged that Merchandise was manufactured or sold to Sears in violation of any applicable federal, state or local laws, regulations, ordinances or administrative orders or rules of the United States, its territories or any country in which Merchandise is produced or delivered or in violation of any Vendor Agreement; (d) Seller refuses to furnish appropriate guaranties to protect Sears as may be requested by Sears pursuant to Section 8.4 above; (e) Seller fails to maintain the insurance required hereunder or fails to produce evidence thereof; (f) Seller becomes the subject of a voluntary or involuntary case under the Federal Bankruptcy Code or similar state or federal insolvency laws; any creditor of Seller commences an action to enforce or foreclose upon a lien or security interest in property of Seller; or any property of Seller passes into the hands of a creditor of Seller, receiver, or assignee for the benefit of creditors, becomes the subject of a levy for taxes or to satisfy a judgment, or otherwise is attached for the benefit of a creditor of Seller; (g) Seller ceases the manufacture or assembly of Merchandise or necessary components incorporated into Merchandise, or announces its intention to do so prior to fulfilling all outstanding Purchase Orders, or otherwise becomes unable for any reason to timely fulfill outstanding Purchase Orders; (h) Seller commits a material breach of any Vendor Agreement relating to such Merchandise; (i) a Change of Control occurs with respect to Seller; (j) Seller changes the location of manufacture or assembly of Merchandise without the prior written consent of Sears or (k) cancellation or termination is otherwise permitted by the UCC or other applicable law. For any imported Merchandise which is subject to a customs embargo or quota restriction, Sears may cancel or terminate any Purchase Order or delay any installment payment or advance in respect of Sears' monetary obligations to Seller, if any, under each applicable Vendor Agreement until the embargo is lifted or necessary quota becomes available.

**15. RECOUPMENT AND SET-OFF.** Sears and Seller acknowledge and agree that Sears' monetary obligations to Seller under the Vendor Agreements shall at all times be net of all Refund Credits, Return Costs, Defense Obligations, Indemnity and Contribution Obligations and other monetary obligations owing by Seller to Sears under any Vendor Agreement or otherwise (collectively, "Seller's Monetary Obligations") and any installment payment or advance made by Sears to Seller in respect of any Vendor Agreement while any Seller's Monetary Obligations are outstanding shall be deemed to be an overpayment to Seller to the extent of such outstanding Seller's Monetary Obligations and shall be subject to recoupment and or set-off by Sears. Without limiting the foregoing, Sears shall have the right, at all times, to deduct any Seller's Monetary Obligations from any amounts owed to Seller by Sears, and to pay only the net sum due, if any. Any Seller's Monetary Obligations that remain outstanding after any exercise by Sears of its recoupment and/or set-off rights shall be paid by Seller promptly upon demand by Sears. For the purpose of Sears' exercise of the right of recoupment and/or set-off only, any raw materials, components and parts sold by Seller to Sears for use in Merchandise, if applicable, shall be deemed to be sold to Sears pursuant to a Purchase Order.

**Sears, Roebuck and Co.**
**Universal Terms and Conditions**

### 16. CONFIDENTIALITY.

16.1 **Proprietary Information.** All Proprietary Information (as hereinafter defined) is the sole and exclusive property of Sears. Seller shall not in any manner use, reproduce or disclose, directly or indirectly, to any third party at any time any Proprietary Information, except in connection with Seller's performance under a Vendor Agreement. Upon demand by Sears, Seller shall deliver to Sears immediately all materials containing Proprietary Information in Seller's possession (whether prepared by Sears or Seller). "Proprietary Information" means: (a) all information relating to Sears' sales, pricing, cost, inventory, operations, plans and programs; (b) all trade secrets of Sears, including any and all customer lists, customer survey responses and any other information concerning any of Sears' customers; (c) any Specification furnished by Sears; (d) patent applications, and other embodiments of Sears' intangible property; and (e) any other information that is not publicly available and is designated by Sears as Proprietary Information. To the extent that Seller provides any information concerning Sears' customers, Seller must implement appropriate measures designed to ensure the security and confidentiality of such customer information, protect against any anticipated threats or hazards to the security or integrity of such information and protect against unauthorized access or use of such information that could result in substantial harm or inconvenience to any such Sears customer.

16.2 **Computer Access.** If Seller is given access, whether on-site or through remote facilities, to any Sears or Sears affiliate computer or electronic data storage system in order for Seller to perform its obligations under any Vendor Agreement, then Seller shall limit such access and use solely to perform such obligations and shall not attempt to access any computer system, electronic file, software or other electronic services other than those specifically required to perform its obligations under such Vendor Agreement. Seller shall limit such access to those of its personnel who need to have such access in connection with such Vendor Agreement, shall advise Sears in writing of the name of each such personnel who will be granted such access, and shall strictly follow all of Sears' security rules and procedures for use of Sears' electronic resources. All user identification numbers and passwords disclosed to Seller and any information obtained by Seller as a result of Seller's access to, and use of, Sears' computer and electronic storage systems shall be deemed to be, and shall be treated as, Proprietary Information. Seller shall cooperate with Sears in the investigation of any apparent unauthorized access by Seller to Sears' computer or electronic data storage systems or unauthorized release of Proprietary Information by Seller.

### 17. MISCELLANEOUS.

17.1 **Assignment by Seller.** All Purchase Orders and other Vendor Agreements are personal to Seller and Seller shall not assign (by contract, operation of law or otherwise) its rights or obligations under any Vendor Agreement or grant a security interest in or pledge as collateral any interest herein or therein, except with Sears' prior written consent, and the failure of Seller to obtain Sears' prior written consent shall render any such attempt to assign or grant a security interest or lien in its rights or obligations void and of no force and effect; provided, however, that Seller may assign its right to receive installment payments or advances from Sears in respect of any monetary obligations of Sears to Seller under any Vendor Agreement, subject to the terms and conditions contained herein. Any factor or permitted assignee, secured creditor or pledgee of Seller shall acquire such interest subject to all of Sears' recoupments, set-offs, claims and defenses and all of the terms and conditions contained herein, and Seller shall notify any such factor, assignee, secured creditor or pledgee of such fact. Sears shall have no obligation to make payments to anyone other than Seller unless and until Seller: (a) notifies Sears in writing of the assignment of such installment payments or advances along with the name and address of the person to whom such installment payments or advances should be sent; (b) obtains a separate Sears accounts payable number for such installment payments or advances; and (c) uses such accounts payable number on every invoice that Sears is to pay directly to the third party. Seller retains responsibility for all allegedly misdirected installment payments or advances that result from Seller's failure to comply with the terms and conditions hereof.

17.2 **Severability.** If any provision of any Vendor Agreement or this UTC is held to be invalid, illegal or unenforceable by a court of competent jurisdiction, then such provision shall be deemed modified to the extent necessary to make such provision enforceable by such court, and the invalidity in whole or in part of any portion of such Vendor Agreement or this UTC shall not impair or affect the validity or enforceability of the remaining provisions of such Vendor Agreement or this UTC.

17.3 **Cumulative Rights.** All rights and remedies under the Vendor Agreements are cumulative, and the exercise of any right or remedy herein provided shall be without prejudice to the right to exercise any other right or remedy provided for herein or at law or in equity.

**Sears, Roebuck and Co.**
**Universal Terms and Conditions**

17.4  Survival. The provisions of Sections 8, 10, 11 and 16 of this UTC shall survive the expiration, cancellation or termination of any Vendor Agreement.

17.5  Governing Law. The Vendor Agreements and the UTC shall be construed and enforced in accordance with the internal laws of the State of Illinois without regard to its conflict of law principles, and the rights and obligations of the parties hereto shall not be governed by the provisions of the United Nations Convention on Contracts for the International Sale of Goods.

17.6  Submission to Jurisdiction. Seller and Sears hereby consent to the personal and subject matter jurisdiction of the state and/or federal courts located in Cook County, Illinois and hereby agree that the proper and exclusive venue for any dispute concerning any Vendor Agreement shall be in such courts. All objections to such jurisdiction or venue are hereby waived. Seller consents to service of process as permitted under Illinois law or by certified mail, return receipt requested.

17.7  Waiver of Jury Trial. Each party to this Agreement hereby irrevocably waives any and all right to trial by jury in any legal proceedings arising out of or relating to this Agreement.

**IN WITNESS WHEREOF,** Seller and Sears have each caused this UTC to be executed by its duly authorized representative as of the date written below and such execution evidences each party's acceptance of and agreement with the terms and conditions set forth herein.

Dated: _____

**SEARS, ROEBUCK AND CO.**                                   **SELLER**

                                                             _Digitalway, Inc._
                                                             Company Name

By: _____                                  By: _Chul_____
        Signature                                                    Signature

Print Name: _____                          Print Name: _Chong Min Kim_

Title: _____                               Title: _President / CEO_

                                                             [PLACE SELLER'S NAME LABEL HERE]

| Agreement #: PA00111389 | | | System Creation Date: Jul/19/2005 | | | |
|---|---|---|---|---|---|---|
| Vendor: DIGITALWAY INC | 139745991 | | **SEARS, ROEBUCK AND CO.** Subsidy Program Agreement 3333 Beverly Road Hoffman Estates, IL 60179 | | | ✓ |
| Factor: | | | | | | |
| Account Manager Address: Butler Square 100 N 6th St Ste 300C Minneapolis, MN 55403 | | Account Manager: Ciresi, Todd | | Phone: 612-344-4711 | | Extension: |
| | | Account Manager Email: toddciresi@griffinintl.com | | Fax: 612-344-4748 | | |
| Buyer Name: Bode, Daniel | | Buyer Email: jbode@sears.com | Buyer Phone: 847-286-4867 | Buyer Fax: 847-286-4994 | Dept: 657 | Location: C2-153 |

General Desc: Digitalway agrees to support 5% on net shipments of portable audio product from 5/1/05-4/29/06 (autobilled monthly)

Desc: Vendor shall rebate to Sears a percent of Sears' net purchases of merchandise from vendor during the effective term.
Digitalway agrees to support 5% on net shipments of portable audio product from 5/1/05-4/29/06 (autobilled monthly)
PA# 111389 Dan Bode 847-286-4876

**Detailed Billing Information**

Terms and Conditions: May/01/2005 - Apr/29/2006
Category: Miscellaneous - Deferred credits - matching
Formula: Percent of Purchases - Net
Subsidy Est.: $50,000.00    Cap:
Billing Method: Sears Debit Memo    JA: DWAYL45
VBU/Division/Line/Item: 657/057/045

Tiers:

**EXHIBIT B**

1. Effective Term. Vendor's obligations under this Subsidy Program Agreement (the "Agreement") shall accrue throughout the Effective Term specified above (and any applicable renewal term indicated in the Program Description), but the provisions regarding billing and payment of Vendor funding shall continue in effect until 30 days after the last "Date to be Billed" shown above (the "Billing Date").
2. Billing/Payment Terms. All Vendor funding payable under such Program above shall be immediately due and payable on the Billing Date. Sears may collect such funding through the Billing Method described above or Sears may deduct payments of such amounts by check on any date after the Billing Date. The amounts to be billed under some Programs shown above are based on Sears' good faith estimates of future purchases, sales or costs. If so, within 10 days after the end of the term, Sears shall calculate the actual Vendor funding accrued under such Program, and Vendor shall pay any additional amounts due immediately upon demand.
3. Estimated Subsidy. Any estimates of Program subsidies are for Sears internal planning purposes only and are not binding on either party. The amounts and terms of any Vendor funding shall be determined solely in accordance with the Program Description above.

| Vendor - By: [signature] | Sears, Roebuck and Co. - By: [signature] |
|---|---|
| Title: President    Date: 7/20 | Title: [signature]    Date: 7/19/05 |